UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RICHARD FOY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 4:18-CV-879 PLC |
| vs. ) | |
| ) | |
| ANDREW M. SAUL,[1] ) | |
| **Commissioner of Social Security** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff Richard Foy seeks review of the decision by Defendant Social Security Commissioner Andrew Saul denying his application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the case is reversed and remanded.

**I.  Background and Procedural History**

In March 2014, Plaintiff, then forty-five years old, filed an application for SSI alleging that he became disabled on September 13, 2010 as a result of "depression, lower back pain, right ankle weakness, [and] nerve damage and numbness throughout extremities."[2] (Tr. 132-37, 374) The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ).[3] (Tr. 380-92, 412-14)

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.

[2] At the hearing, Plaintiff amended his alleged onset date to October 24, 2015. (Tr. 309)

[3] The SSA denied Plaintiff's previous applications for Social Security benefits, which he filed in May 2008 and September 2010. (Tr. 15)

In April 2017, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified.[4] (Tr. 306-47) In a decision dated May 10, 2017, the ALJ found that Plaintiff had "not been under a disability, as defined in the Social Security Act, from October 24, 2015, through the date of this decision." (Tr. 15-32) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. Evidence Before the ALJ

Plaintiff testified that he weighed 450 pounds[5] and had been living at a long-term care facility, called Rancho Manor, for a year and a half. (Tr. 330-31) Plaintiff stated that he most recently worked as a janitor at a church in April or March 2015.[6] (Tr. 313) He explained that he worked for "about a month before the pain of the osteomyelitis started kicking in." (Id.)

Plaintiff testified that, in 2014, he received a college degree in graphic communications with the "intention…to go into the work field and be a graphic designer." (Tr. 314) He explained that he was unable to work as a graphic designer because, "due to the osteomyelitis,…I can't hold the phone very long, or a pencil, or any kind of material very long with this arm before my arm goes numb." (Tr. 314-15) Plaintiff stated that he had "always had an issue with my right arm," but the osteomyelitis "damaged the nerve in my spine, and it caused that to get numb a lot faster." (Id.)

---

[4] Plaintiff first appeared before the ALJ in July 2016, and the ALJ continued the case to allow Plaintiff time to retain counsel. (Tr. 294-305)
[5] Plaintiff's medical records reflect that he was seventy-four inches tall. (Tr. 671)
[6] Based on Plaintiff's medical records, it appears that Plaintiff was performing janitorial work in October 2015. (See Tr. 998)

2

Plaintiff's primary problems were "pain in my back, and tingling in my arms and legs," as well as "a lot of pain in my hips." (Tr. 318) The ALJ observed that Plaintiff was wearing a brace on his left forearm, and Plaintiff explained "I have tennis elbow….I can't pull anything, or hold anything with this arm." (Tr. 323)

Plaintiff used a manual wheelchair "early in the mornings because wa[l]king is impossible because of the pain." (Tr. 315, 319) After about an hour and a half, Plaintiff was able to walk with the use of a cane, which he had been using for the past seven or eight months. (Tr. 316) Plaintiff estimated that he was able to walk half a block, stand "maybe five minutes," and sit "[p]robably ten or 15 minutes." (Tr. 317) Plaintiff had "to lay down at periods during the day because my back hurts really bad." (Tr. 315) He estimated that, over the course of a day, he would usually lie down "[p]robably about an hour." (Tr. 318) On his worst days, which occurred "about once every two to three weeks," he would lie down "[m]ost of the day." (Tr. 318-19) Plaintiff was able to lift and carry a gallon of milk. (Tr. 318)

Plaintiff took Neurontin "for the nerve damage" and "Percocet for pain." (Tr. 320-21) He testified that the Neurontin "makes me really sleepy." (Tr. 320) Plaintiff had been taking Percocet since October 2015. (Tr. 321) Plaintiff did not like taking narcotics and he "felt better…mentally" when his doctors decreased his dosage "because in my past I used to be on drugs and alcohol, so I really try to avoid that." (Tr. 321) Plaintiff rated his current pain as "[a] four, four and a half." (Tr. 335)

In regard to his mental impairments, Plaintiff testified that his depression had "gotten a lot better" but "I still have issues with it." (Tr. 325) He believed "the medication has really helped me a lot[.]" (Tr. 326)

Plaintiff stated that the staff at Rancho Manor cooked, cleaned, made his bed, washed his clothes, and filled his ice pitcher. (Tr. 323) He testified that if he were to live in an apartment, he would "probably need some assistance like with…chores, cleaning, like doing laundry…stuff life that," but, if he had a washer and dryer, he "probably could" do his laundry. (Tr. 331) Plaintiff also believed he would be able to shower and "keep [him]self clean and healthy." (Tr. 332) Plaintiff was unable to tie his shoelaces and required help putting on his shoes and socks. (Tr. 323) Plaintiff testified that he loved to read and had no difficulty remembering what he read. (Tr. 328) He usually read for "a couple hours" at a time. (Tr. 329)

A vocational expert also testified at the hearing. (Tr. 339-47) The ALJ asked the vocational expert to consider a hypothetical individual able to perform sedentary work who: "is able to stoop, kneel, crouch, and crawl occasionally; is able to perform work that does not require the operation of foot controls, or climbing ladders; is able to perform work that is simple, and will respond appropriately to at least routine changes in a work environment." (Tr. 339) The vocational expert responded that the hypothetical individual would not be able to perform Plaintiff's past relevant work, but could perform the jobs of document preparer, addresser, and charge account clerk. (Tr. 340) When Plaintiff's counsel added that the hypothetical individual "was limited to less than frequent use of the right-dominant upper extremity for grasping, handling, and fingering," the vocational expert stated that such an individual "would be precluded from the job examples I gave." (Tr. 344)

With respect to Plaintiff's medical treatment records, the Court adopts the facts provided by Plaintiff in his statement of material facts and admitted by the Commissioner. (ECF Nos. 24, 29-1) The Court will address specific facts related to the issues raised by Plaintiff as needed in the discussion below.

### III. Standard for Determining Disability Under the Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1). Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the

Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV. ALJ Decision

Applying the foregoing five-step analysis, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since October 24, 2015; and (2) had the severe impairments of degenerative disc disease of the lumbar spine, residuals of osteomyelitis of the spine, obesity, and mood disorder. (Tr. 18) Additionally, the ALJ determined that Plaintiff had the following non-severe impairments: cervical and thoracic degenerative disc disease; osteoarthritis and/or degenerative joint disease of the hips, knees, and ankles; left lateral epicondylitis; diabetes mellitus with neuropathy; hypertension; and history of ADHD and polysubstance use in remission. (Id.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20)

The ALJ reviewed Plaintiff's testimony and medical records and determined that, while his "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 24) In particular, the ALJ found that Plaintiff's complaints of debilitating pain were inconsistent with the objective medical evidence and Plaintiff's work history, noncompliance with treatment recommendations, conservative treatment, and improvement with treatment. (Tr. 24-28)

The ALJ determined that Plaintiff had the RFC to perform a range of sedentary work with the following limitations:

> [H]e is occasionally able to stoop, kneel, crouch and crawl. He is able to perform work that does not require the operation of foot controls or climbing ladders. He is able to perform work that allows him to use a cane in one hand if required to walk more than 50 feet and is able to do the lifting and carrying required by sedentary work using the free hand alone. The claimant is able to perform work that is simple and to respond appropriately to routine changes in the work environment.

(Tr. 23) At step four of the sequential evaluation, the ALJ found that Plaintiff was unable to perform his past relevant work. (Tr. 31) However, based on the vocational expert's testimony, the ALJ found that there existed a significant number of jobs in the national economy that Plaintiff was able to perform, including those of document preparer, addresser, and charge account clerk. (Tr. 31-32) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 32)

**V.      Discussion**

Plaintiff claims the ALJ erred in determining his RFC because "it was not supported by medical evidence and the decision contained no rationale for the limitations contained therein." [ECF No. 23 at 2-3] Plaintiff also argues that the ALJ improperly characterized certain impairments as non-severe and discounted Plaintiff's allegations of disabling pain. In response, the Commissioner asserts that: (1) the ALJ properly considered all of the evidence in the record as a whole, including the medical opinions, to determine Plaintiff's RFC; and (2) substantial evidence supported the ALJ's consideration of Plaintiff's severe and non-severe impairments. [ECF No. 29]

   A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a

reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Medical evidence

Plaintiff argues that the ALJ erred in assessing his RFC because it was not supported by medical evidence. Plaintiff also asserts that it is unclear how the ALJ concluded from the medical evidence that he was capable of performing sedentary work. Finally, Plaintiff challenges the ALJ's reliance on medical opinions that predated Plaintiff's alleged onset date. The Commissioner counters that, when formulating Plaintiff's RFC, the ALJ properly considered all the evidence in the record, including the medical opinions.

RFC is the most a claimant can still do in a work setting despite that claimant's physical or mental limitations. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 416.945(a)(1). An ALJ determines a claimant's RFC "based on all the relevant

8

evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

The only consultative physical examination report contained in the record was dated August 2014. (Tr. 671-78) The report states that Plaintiff weighed 419 pounds and the exam was "poor…because he cannot move around to be examined and he did not undress to put a gown on[.]" (Tr. 673) Physical examination revealed: severe pain in the lumbar spine; tender right shoulder with positive impingement sign; pain and numbness that radiated from the right shoulder distally; hypesthesia from his right hip that radiated distally and pain distally to the toes; reduced lumbar and hip range of motion; and tenderness in both ankles. (Tr. 674) Plaintiff walked slowly and "only with 2 crutches at a time." (Tr. 674) The consulting examiner did not assess Plaintiff's residual functional capacity.

Plaintiff's subsequent medical records reveal that his physical condition deteriorated after his October 24, 2015 alleged onset date. Between October 24 and November 20, 2015, Plaintiff

9

presented to several different emergency rooms with severe back pain radiating to his lower left abdomen and groin. (Tr. 902-04, 911-13, 992-1010, 1015-52) An MRI in November 2015 revealed degenerative disc disease, most prominent at L5-S1, advanced degenerative changes of the right hip, and possible early discitis or osteomyelitis. (Tr. 930, 1057) Following a biopsy, Plaintiff was diagnosed with chronic osteomyelitis at S1 and, on November 26, he transferred to Rancho Manor Healthcare and Rehabilitation Center for a six-week course of IV therapy. (Tr. 752, 1056-58)

Treatment notes from December 2015 reflected that Plaintiff used a wheelchair and complained of low back pain, fatigue, movement limitation, edema, anxiety, and depression. (Tr. 781) When Plaintiff followed up with his infectious disease doctor in February 2016, he reported that his back pain was "improving slowly" but "he cannot walk unassisted." (Tr. 1058)

In June 2016, Plaintiff saw a nurse practitioner with LaBonte Medical Group and reported tinnitus, neuropathy, and edema. (Tr. 779) The nurse practitioner continued Plaintiff's gabapentin. (Id.) When Plaintiff returned the following month, he complained of "nerve pain," and a nurse practitioner continued his gabapentin. (Tr. 778)

In August 2016, Plaintiff saw Dr. Ahmed at St. Louis Medical Rehabilitation Group for treatment of his pain. (Tr. 764) Dr. Ahmed noted that Plaintiff's pain interfered with activities of daily living, he was ambulating with a cane, and his straight leg raise test was positive bilaterally. (Id.) Dr. Ahmed diagnosed Plaintiff with neuropathy, which was "stable on gabapentin," and chronic low back pain. (Id.) Progress notes from Rancho Manor the same month reflected that Plaintiff required assistance with transfers and showers and he was able to use a "quad cane with 1 staff member for short distance ambulation." (Tr. 769)

In early September 2016, Plaintiff presented to LaBonte Medical Group with complaints of neuropathy and lower extremity edema. (Tr. 777) On examination, a nurse practitioner noted unsteady gate, edema of the lower extremities, and generalized weakness. (Tr. 777)

Less than two weeks later, Plaintiff presented to St. Louis Medical Rehabilitation Group with hip and low back pain. (Tr. 760) Plaintiff rated his back pain as 10/10 at its worst and 4/10 at its best, and explained that it was "made worse by movement, sitting a long time, standing a long time and walking." (Id.) Plaintiff rated his hip pain as 8/10 at its worst and 2/10 at its best. (Id.) His medications at that time included: baclofen, gabapentin, oxycodone, duloxetine, meloxicam, and naproxen. (Tr. 761) On examination, the nurse practitioner noted that Plaintiff used a walker, straight leg raise was 30 degrees on the right with pain and 60 degrees on the left, and lower extremity strength of flexors was 3/5 bilaterally. (Tr. 762) Plaintiff had decreased range of motion with pain in both hips. (Tr. 761) Later that month, Plaintiff was able to ambulate short distances and also used a wheelchair. (Tr. 776)

In late-September 2016, Plaintiff established care with neurologist Dr. Kaul for "pain, numbness, tingling of legs and right arm." (Tr. 943) Plaintiff reported the symptoms began twelve years earlier "but ha[ve] progressively gotten worse." (Id.) He reported that taking gabapentin, baclofen, and Cymbalta "does help." (Id.) On examination, Dr. Kaul observed that Plaintiff's sensation was "reduced to light touch and vibration," Achilles and patellar reflexes "trace to absent," and he walked with a cane. (Tr. 946) Dr. Kaul diagnosed Plaintiff with: numbness and tingling; lumbosacral radiculopathy; leg weakness, bilateral; and arthralgia of both lower legs. (Tr. 947) Dr. Kaul ordered several tests, including nerve conduction studies, which showed "chronic bilateral, left worse than right L5, S1 polyradiculopathy with evidence of few

sharp waves in Left L5, S1 myotome" and "mild sensory neuropathy affecting lower extremities as suggested by absent or low superficial peroneal SNAPs." (Tr. 940, 949)

At his appointment with LaBonte Medical Group in November 2016, Plaintiff used a wheelchair and complained of neuropathy in both feet. (Tr. 765) The examining physician noted that Plaintiff's neuropathy was unchanged and continued Plaintiff's Neurontin and Cymbalta. (Id.) When Plaintiff followed up in December 2016, he was using a wheelchair and complained of neuropathy and edema. (Tr. 775) His medications included oxycodone, gabapentin, and baclofen. (Tr. 750) Plaintiff returned five days later with "uncontrolled" diabetes and elevated triglycerides. (Tr. 766) A nurse practitioner prescribed Lantus and vitamin D. (Id.)

Plaintiff followed up with Dr. Kaul in December 2016 and reported "intermittent numbness of right arm. Leg [sic]. Back and pelvis hurts all the time. Hears popping sounds in back. No falls." (Tr. 949) On examination, Plaintiff's deep tendon reflexes were trace at knee and absent in ankle and sensation was "reduced vibration at knee, absent Till [sic] ankle[.]" (Tr. 950) Dr. Kumar recommended gabapentin and weight loss. (Tr. 591)

Plaintiff returned to LaBonte Medical Group in January 2017, complaining of neuropathy, headache, weakness, back pain, and joint/muscle pain. (Tr. 774) A nurse practitioner noted that Plaintiff was using a wheelchair and his neuropathy was stable. Id. Plaintiff returned two days later with elevated blood sugar. (Tr. 772) On examination, a nurse practitioner noted diminished breath sounds, use of a wheelchair, generalized weakness, and 1+ edema in the bilateral lower extremities." (Tr. 772) Progress notes from Rancho Manor stated that Plaintiff was provided oxycodone for low back pain. (Tr. 745)

In mid-January 2017, Plaintiff sought treatment for low back pain at Rancho Manor. (Tr. 757) He also complained of joint pain, bilateral hip and knee pain, and neuropathy. (Tr. 758) On examination, the nurse practitioner noted that Plaintiff's right knee was tender to palpation and his left knee was tender to palpation "at times." (Id.) Motor strength of the bilateral lower extremities was 3/5. (Id.)

At the hearing in April 2017, Plaintiff testified that he was unable to work as a result of back and hip pain and "tingling in my arms and legs." Plaintiff explained that, due to the "numbing problem in this right arm[,]…I can't hold the phone very long, or a pencil, or any kind of material very long with this arm before my arm goes numb." (Tr. 314-15) Plaintiff explained that he "always had an issue with my right arm" but the osteomyelitis exacerbated the problem. (Id.) Plaintiff testified that he used a wheelchair for about an hour and a half in the mornings, and then used a cane. He estimated that he was able to stand about five minutes, sit ten to fifteen minutes, and walk half a block. As a result of his pain, Plaintiff had to alternate positions throughout the day. Nursing home staff assisted Plaintiff with activities of daily living.

As previously discussed, the ALJ found that Plaintiff had the RFC to perform simple, sedentary work with the following limitations: occasional stooping, kneeling, crouching, and crawling; no climbing ladders or operating foot controls; and the ability to use a cane if required to walk more than fifty feet. The ALJ included no durational limitations, requirements for sit/stand options, or restrictions on the use of Plaintiff's hands beyond "work that allows him to use a cane in one hand if required to walk more than 50 feet…."

After reviewing the ALJ's decision and the medical records, the Court finds no medical opinion evidence relating to Plaintiff's physical ability to function in the workplace after his alleged onset date of October 24, 2015. The only medical opinions in the record were rendered

in August 2014, over one year before Plaintiff's November 2015 osteomyelitis diagnosis and hospitalization. While the record contains multiple medical treatment records detailing Plaintiff's impairments, there is not a single opinion from any provider about how those impairments limited Plaintiff's abilities after October 2015.

Sedentary work generally requires the ability to sit for six hours of an eight-hour workday. SSR 96-9P, 1996 WL 374185, at *3 (July 2, 1996); Chitwood v. Bowen, 788 F.2d 1376, 1378 (8th Cir. 1986) ("The capacity to perform sedentary work…is predicated on an ability to sit for a prolonged period of time."). However, no medical source opined that Plaintiff could sit for six hours in an eight-hour workday. See Loveland v. Astrue, 734 F.Supp.2d 857, 868 (E.D. Mo. 2010). In fact, the only evidence in the record relating to Plaintiff's ability to sit after October 2015 was his testimony that he could sit "probably ten to fifteen minutes."

Furthermore, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity." SSR 96-9P, 1996 WL 374185, at *8. Plaintiff's medical records reflect that, during the relevant time period, he consistently reported to providers pain, tingling, and numbness in his right arm and hand. At the hearing, Plaintiff testified that these symptoms prevented him from holding a pencil or a telephone. While the ALJ acknowledged that Plaintiff "has alleged some limitations" in his ability to perform fine and gross movements, neither the ALJ nor any examining physician discussed to what extent, if any, these limitations affected his ability to work. On the administrative record in this case, the only way the ALJ could have determined Plaintiff's RFC was to "draw his own inferences from medical reports," which an ALJ may not do under the Social Security Act. See Krewinghaus v. Berryhill, No. 4:18-CV-377 DNN, 2019 WL 1015062, at *4 (E.D. Mo. Mar. 4, 2019) (citing Nevland, 204 F.3d at 858).

The Commissioner suggests that it was Plaintiff's burden "to show that he is incapable of performing his RFC" and the ALJ properly considered the fact that "no treating physician opined that Plaintiff had greater limitations than those included in the RFC." [ECF No. 29 at 10] However, "[w]ell-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citations omitted). See also 20 C.F.R. § 416.945(a)(3) ("before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary…."). "Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work." Byes v. Astrue, 687 F.3d 913, 916 (8th Cir. 2012).

Because there was no medical evidence in the record relating to how Plaintiff's impairments affected his ability to function in the workplace, the ALJ should have ordered consultative examinations. See, e.g., Smith v. Barnhart, 435 F.3d 926, 931 (8th Cir. 2006); Krewinghaus, 2019 WL 1015062, at *4; Liffick v. Colvin, No. 2:14-CV-10 NAB, 2014 WL 5782999, at *3 (E.D. Mo. Nov. 6, 2014). The failure of the ALJ to obtain a medical opinion relating to Plaintiff's functional limitations renders the ALJ's RFC determination unsupported by substantial evidence. The case is remanded to the ALJ for further development of the record.[7]

In sum, based on the evidence in the record as a whole, the Court finds that the ALJ's RFC determination was not supported by "some medical evidence" addressing Plaintiff's ability to function in the workplace. Accordingly, the Court reverses and remands the case to the ALJ

---

[7] Plaintiff also alleged that the ALJ improperly characterized certain impairments as non-severe and discounted Plaintiff's subjective complaints. Because the Court reverses on Plaintiff's first argument, it does not address his other arguments.

for further consideration, which might require supplementation with the opinion of a medical examiner as to Plaintiff's ability to function in the workplace. See Lauer, 245 F.3d at 704-6; Loveland, 734 F.Supp.2d at 868-69. With regard to Plaintiff's mental impairments, the Court notes that the evidence in the record arguably supports the ALJ's mental RFC assessment. However, on remand, in considering Plaintiff's RFC, the ALJ must assess the combined effect of both his mental and physical impairments. See 20 C.F.R. § 416.923 ("[W]e will consider the combined effect of all of your impairments ... the combined impact of the impairments will be considered throughout the disability determination process"); Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir.2000) (noting that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

## VI. Conclusion

For the reasons set forth above, the court finds that the Commissioner's decision was not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED** that pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

*/s/ Patricia L. Cohen*
_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of November, 2019